UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

Filed & Entered
On Docket
April 24, 2020

_____

**In re:**
    Birch Wood Inc.,
         Debtor.

Chapter 7
Case # 18-10184
_____

**In re:**
Birch Wood Inc.,
       Plaintiff,
    vs.
Northborough Capital Partners, LLC,
       Defendant.

Adversary Proceeding
# 18-01004
_____

Appearances:  David N. Dunn, Esq.           Andre D. Bouffard, Esq.
                   Phillips, Dunn, Shriver & Carroll, P.C.  Downs Rachlin Martin, PLLC
                   Brattleboro, VT                      Burlington, VT
                   For Birch Wood Inc.               For Northborough Capital Partners, LLC

                                                                              Thomas E. Carlotto, Esq.
                                                                              Christopher J. Fragomeni, Esq.
                                                                              Shechtman Halperin Savage, LLP
                                                                              Pawtucket, RI
                                                                              For Northborough Capital Partners, LLC

**MEMORANDUM OF DECISION**
**GRANTING IN PART AND DENYING IN PART BIRCH WOOD'S MOTION FOR SUMMARY JUDGMENT**
**AND DENYING NORTHBOROUGH'S MOTION FOR SUMMARY JUDGMENT**

       The Plaintiff, Birch Wood Inc., and the Defendant, Northborough Capital Partners, LLC, have filed cross-motions for summary judgment. Birch Wood seeks summary judgment on its claims that Northborough violated the Vermont Licensed Lender Act, 8 V.S.A. § 2200 et seq. (the "LLA"), did so knowingly and willfully, and also violated the Vermont Consumer Fraud Act, 9 V.S.A. §§ 2451 et seq. (the "CFA"). Northborough seeks summary judgment that it did not violate either the LLA or the CFA.

1

For the reasons articulated below, the Court finds there are material facts in dispute with respect to all but one of the issues raised in the cross-motions, there are no material facts in dispute regarding whether the loan in question is an out-of-state mortgage loan, and Birch Wood is entitled to judgment as a matter of law on that issue. Therefore, the Court grants Birch Wood's summary judgment motion on that claim, denies the balance of Birch Wood's motion, and denies Northborough's summary judgment motion in its entirety.

## JURISDICTION

This Court has jurisdiction over this adversary proceeding, and each of the motions for summary judgment (the "SJ Motions"), pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. This a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(B) and (K), and thus this Court has constitutional authority to enter a final judgment.

## PROCEDURAL HISTORY

Birch Wood Inc. ("Birch Wood") filed a petition under chapter 11 on May 1, 2018, and five months later, voluntarily converted its case to a case under chapter 7 (case # 18-10184, doc. ## 1, 58, 59). On April 17, 2019, Northborough Capital Partners, LLC ("Northborough") filed a motion for relief from stay (case # 18-10184, doc. # 79, the "RFS Motion"), to pursue its non-bankruptcy legal remedies and foreclose on Birch Wood's real property located at 327 Fletcher Schoolhouse Road, South Woodstock, Vermont (the "Property"), which Northborough asserts is collateral for its claim against Birch Wood. On September 10, 2018, Birch Wood commenced this adversary proceeding ("AP") against Northborough (AP # 18-1004, doc. # 1). The chapter 7 case trustee filed an objection to the RFS Motion requesting the Court deny the RFS Motion, or defer decision on it until resolution of the AP (case # 18-10184, doc. # 83). The chapter 7 trustee for the bankruptcy case of Birch Wood's principals, Gary and Angela Moore (the "Moores"), also filed an objection to the RFS Motion (case # 18-10184, doc. # 81) taking the same position. On July 29, 2019, the Court entered an Order, inter alia, deferring adjudication of the RFS Motion until it entered its determination in the AP (case # 18-10184, doc. # 97; AP # 18-1004, doc. # 43).

On June 14, 2019, Northborough filed its SJ Motion in the AP (AP # 18-1004, doc. # 33),[1] and Birch Wood filed an objection to it (doc. # 34). On July 5, 2019, Birch Wood filed its SJ Motion, which Northborough sought to strike, and Birch Wood defended (doc. ## 35, 36, 41). On July 26, 2019, Northborough also filed an objection to Birch Wood's SJ Motion (doc. # 42). Three days later, the Court denied Northborough's motion to strike (doc. # 43).

---

[1] Hereafter, all docket citations refer to the instant AP # 18-1004 unless otherwise specified.

On October 2, 2019, the parties filed a joint pre-trial statement, in which they requested leave to file additional memoranda of law, to address Northborough's defense under 8 V.S.A. § 2221 (doc. # 45). On October 28, 2019, the Court entered an Order granting the parties' request for additional time to file supplemental briefs and vacating an earlier order setting oral argument on the SJ Motions (doc. # 49). Birch Wood filed a timely response to Northborough's supplemental memorandum (doc. # 46, 51). On November 22, 2019, Northborough filed a supplemental statement of undisputed facts (doc. # 54), and Birch Wood filed a supplemental statement on the same date (doc. # 55). On December 5, 2019, Northborough filed a supplemental memorandum in support of its SJ Motion and in opposition to Birch Wood's SJ Motion (doc. # 57). Thereafter, Birch Wood filed a response to Northborough's amended statement of undisputed facts (doc. # 58), and Northborough filed a reply (doc. # 59).

On December 17, 2019, the Court held a hearing on the SJ Motions, at which David N. Dunn, Esq., appeared on behalf of Birch Wood and Andre D. Bouffard, Esq., appeared on behalf of Northborough, to present oral argument in support of their respective legal positions. After the hearing, Northborough filed a supplement regarding a question raised at oral argument (doc. # 60), and the Court then took the matter under advisement.

## ISSUES PRESENTED

The SJ Motions present four issues. The first and most structurally complex issue is whether the Vermont Licensed Lender Act applies to the parties' loan transaction. It requires the Court to engage in a multi-part inquiry into the LLA's complicated web of overlapping and intersecting criteria for discerning which lenders and which transactions fall within the LLA's reach. To establish the subject loan transaction is not governed by the LLA, Northborough must show at least one of the following criteria is met: (i) the loan is exempt from application of the LLA under 8 V.S.A. § 2201 because it is a commercial loan and secured by property that was not owner occupied; (ii) the loan is exempt from application of the LLA under 8 V.S.A. § 2221 as an out-of-state mortgage loan; (iii) Northborough is not subject to application of the LLA because it is not engaged in the business of making loans; or (iv) the loan transaction is not subject to application of the LLA because Rhode Island law governs this loan transaction. Birch Wood can only prevail on the first issue if it demonstrates none of those four criteria – any of which would render the LLA inapplicable – are met.

The second issue is whether Northborough violated the LLA; if so, then the third issue arises, namely, whether Northborough violated the LLA knowingly and willfully. The fourth issue is whether Northborough violated the Vermont Consumer Fraud Act.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also

3

Jackson v. Fed. Express, 766 F.3d 189, 193–94 (2d Cir. 2014). "A genuine issue exists – and summary judgment is therefore improper – where the evidence is such that a reasonable jury could decide in the non-movant's favor." Brandon v. Kinter, 938 F.3d 21, 31 (2d Cir. 2019) (citation and quotation marks omitted). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1985) (citation omitted). "The court construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in his favor." Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)); see also Burns v. Martuscello, 890 F.3d 77, 83 (2d Cir. 2018). However, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" Flores v. United States, 885 F.3d 119 (2d Cir. 2018) (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).

## UNDISPUTED MATERIAL FACTS

The Court finds the following are undisputed material facts (each, a "UMF"):[2]

### *The Moores' Other Business Interests and Loans*

1. Angela Moore started a business in 1998 that sold ladies fashion and jewelry designed by her, called "Angela Moore, Inc." Its first store location was in Newport, Rhode Island, and the company opened a second store location in Palm Beach, Florida, developed a website for online sales, and began selling their products on QVC (a television shopping channel). (Doc. # 54, ¶ 1; doc. # 58.)

2. Gary Moore is a college graduate with a lengthy business career that began in the early 1980s, who joined Angela Moore, Inc. as CEO in 1998 or 1999. (Doc. # 54, ¶ 1; doc. # 58.)

3. The Moores owned and operated Angela Moore, Inc., with locations in Rhode Island and Florida, until March 2017, and were the only owners of the company. (Doc. # 35-1, ¶ 5; doc. # 42-2, ¶ 5; doc. # 54, ¶ 2; doc. # 58.)

4. The Moores also acquired interests in other companies during the 1980s. (Doc. # 54, ¶ 1; doc. # 58.)

5. Mr. Kahn made loans to Angela Moore, Inc., over a period of several years after 2011, which Angela Moore, Inc. used to buy inventory and finance the opening of new stores in Vero Beach, Manaplan,

---

[2] The Court treats as disputed any alleged facts included in a party's supplemental statement of facts to the extent previously alleged in an earlier-filed statement of facts and previously disputed in an earlier-filed response, even where not expressly disputed a second time in response to the supplemental statement of facts. The Court also treats as disputed any alleged facts that are recitations of a person's knowledge, intent, motive, or subjective feelings. "Summary judgment is particularly inappropriate where 'the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions.'" Cross v. United States, 336 F.2d 431, 433 (2d Cir. 1964) (citing Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962); Alabama Great So. R.R. v. Louisville & Nashville R.R., 224 F.2d 1, 5 (5th Cir. 1955); Subin v. Goldsmith, 224 F.2d 753, 758 (2d Cir. 1955)). See also Schoenbaum v. Firstbrook, 405 F.2d 215, 218 (2d Cir. 1967) ("Indeed in many stockholder's derivative actions there will be issues as to the knowledge, intent and motive which will require a full trial with an opportunity to observe the demeanor of the witnesses, and to conduct cross-examination in open court. In such cases summary judgment cannot be granted even after discovery has been had.") (citing Subin, 224 F.2d at 757; Poller v. CBS, 368 U.S. 464, 473 (1962); Cross, 336 F.2d at 434; Alvado v. General Motors Corp., 229 F.2d 408, 411–12 (2d Cir. 1955), cert. denied, 351 U.S. 983 (1956)).

4

and Wellington, Florida. (Doc. # 54, ¶ 6; doc. # 58.)

6. Angela Moore, Inc., had loan relationships with Bank of America for a line of credit and with John Noffo Kahn, who had loaned the company over one million dollars. In March 2017, the Moores put the company into receivership because of problems in the retail business and business losses. When the Moores closed the business, Bank of America and Mr. Kahn were its primary creditors. (Doc. # 54, ¶ 2; doc. # 58.)

### *The Moores' Non-Vermont Properties*

7. The Moores resided in Newport, Rhode Island until 2007, when they sold their Rhode Island home and became residents of Florida and had Florida driver's licenses. (Doc. # 54, ¶ 3; doc. # 58.)

8. Around the time they sold their Newport, Rhode Island home in 2007, the Moores purchased the Property.[3] (Doc. # 35-1, ¶ 1; doc. # 42-2, ¶ 1; doc. # 54, ¶ 3; doc. # 58.)

9. The Moores also purchased a home in Ocean Ridge, Florida, and at various times they also had multiple apartments in Newport, Rhode Island, and Palm Beach, Florida.[4] (Doc. # 54, ¶ 3; doc. # 58.)

10. The Moores had an apartment in Newport, Rhode Island, in which they lived for part of 2017. (Doc. # 54, ¶ 4; doc. # 58.)

### *The Settlement Agreement*

11. On February 3, 2016, the Moores executed a resolution agreement with Mr. Kahn, relating to the loan he had made to them, which then had an unpaid balance of $3,247,080.83 (the "Resolution Agreement"). The Moores had used a significant portion of the money they had borrowed from Mr. Kahn to purchase the Moores' Ocean Ridge, Florida home. The Resolution Agreement required the Moores to deliver a note to Mr. Khan in the amount of the debt secured by the Property and to deed their Florida home to Mr. Kahn. It also provided that, upon closing, the Moores would receive a credit on the note of $2.225 million less an unfixed amount for cure pertaining to a license agreement also at issue between those parties. (Doc. # 35-1, ¶ 3; doc. # 35-4; doc. # 42-2, ¶ 3; doc. # 54, ¶ 7; doc. # 58.)

12. The Moores did not timely meet their obligations under the Resolution Agreement. (Doc. # 35-1, ¶ 4; doc. # 35-5; doc. # 42-2, ¶ 4.)

13. In October 2016, Mr. Kahn sued the Moores in the Vermont Superior Court to foreclose the mortgage they had granted him on the Property in the Resolution Agreement, alleging an unpaid indebtedness of $1.14 million. In the same month, the Moores sued Mr. Kahn in the United States District Court for the District of Rhode Island, alleging extortion and other torts arising out of their business and personal disputes. Their complaint stated the Moores were residents of Rhode Island. (Doc. # 54, ¶ 8; doc. # 58.)

14. The Moores and Mr. Kahn settled both lawsuits through mediation and, on February 10, 2017, entered into a settlement agreement (the "Settlement Agreement"), which stated "Option 1: ... [The Moores] shall have the option to pay [Mr.] Kahn ... $950,000.00[] in full settlement of the Lawsuit ... no later than 5 P.M. on March 13, 2017 ... Option Two: ... In the event that [the Moores do] not timely make the Option Payment described in paragraph One, [the Moores] shall convey their residence property in South Woodstock VT that is the subject of the Lawsuit to Kahn." (Doc. # 35-1, ¶ 4; doc. # 35-5; doc. # 42-2, ¶ 4; doc. # 54, ¶ 9; doc. # 58.)

### *The Moores' Inquiry About a Loan*

15. The Moores sought financing to fund the payment required under the Settlement Agreement. (Doc. # 54, ¶ 10; doc. # 58.)

---

[3] The parties' statements of facts do not specify the date of this purchase or how title to the Property was held.
[4] The parties' statements of facts do not specify the dates when the Moores owned, rented, or occupied these properties.

5

16. The Moores contacted George Marderosian of Clubhouse Capital, LLC about a loan. They then signed an agency agreement with Clubhouse Capital, LLC, on February 15, 2017, and hired Mr. Marderosian as their agent for the loan transaction with Northborough (the "Loan Transaction"). Mr. Marderosian has an office in Rhode Island. (Doc. # 33-2, ¶ 26; doc. # 34-1, ¶ 26; doc. # 35-1, ¶ 6; doc. # 42-2, ¶ 6.)

17. The Moores provided Mr. Marderosian with a copy of the Settlement Agreement. (Doc. # 35-1, ¶ 7; doc. # 42-2, ¶ 7.)

18. Scott B. Adams is the Managing Director for Northborough Capital Partners, LLC. On February 19 and 20, 2017, Mr. Adams received emails from Mr. Marderosian about the loan the Moores sought, one of which stated, "[t]he Moores are in litigation with a business associate, who invested $$ and took a mortgage on their VT home. They have settled that matter and must pay him $950k. They are converting their business from a retail (bricks and mortar) operation with storefronts in upscale resort communities (Vero Beach, Newport, etc.) to 100% online and corporate sales. Loan proceeds will pay off TD Bank ($200k), the former associate ($950k), and two law firms that managed the mediation process. Also, to fund an interest escrow for 6mos[.] The Moores are selling the home, will list it with Sotheby[']s the minute we close. They are hoping to drag out $100-200 to invest into the business as well. Loan request is $1.7 mm." (Doc. # 33-2, ¶¶ 3–4; doc. # 33-3; doc. # 34-1, ¶¶ 3–4; doc. # 54, ¶ 11, doc. # 58.)

19. Mr. Marderosian attached a copy of the Settlement Agreement to the February 19, 2017 email. (Doc. # 33-2, ¶¶ 3–4; doc. # 33-3; doc. # 34-1, ¶¶ 3–4; doc. # 35-1, ¶ 9; doc. # 42-2, ¶ 9.)

20. Northborough was aware of the Moores' payment obligations under the Settlement Agreement. (Doc. # 35-1, ¶ 11; doc. # 35-5; doc. # 42-2, ¶ 11.)

21. The Moores never submitted a formal loan application to Northborough. (Doc. # 54, ¶ 11; doc. # 58.)

22. On February 21, 2017, Mr. Moore emailed Mr. Marderosian questions about the loan, including whether the loan could be structured as a line of credit and whether the borrower would need to be an LLC, and Mr. Marderosian replied, "Can't be line if [sic] credit, sorry. Need VT title atty. property to be quitclaimed to LLC owners by you and Angela, as lender makes loans only to business entities." (Doc. # doc. # 33-2, ¶ 6; doc. # 33-4; doc. # 34-1, ¶ 6; doc. # 54, ¶ 14; doc. # 58.)

*Northborough's Due Diligence*

23. In relation to the loan inquiry from Mr. Marderosian, Mr. Adams undertook certain information gathering relative to consideration of a loan along the terms Mr. Marderosian had proposed. (Doc. # 33-2, ¶¶ 1, 7; doc. # 34-1, ¶¶ 1, 7.)

24. In connection with the due diligence for the requested loan, Northborough received the Moores' most recent tax returns, for tax year 2015. That return identified the Moores' residence as Newport, Rhode Island. Mr. Adams also (a) completed a site visit to the Property on or about February 25, 2017, with Mr. Moore present; (b) obtained an appraisal of the Property undertaken by Derek M. MacDonald; and (c) discussed with Mr. Moore the transaction that necessitated a bridge loan, to permit time for the sale of the Property. (Doc. # 33-2, ¶ 8; doc. # 33-5; doc. # 34-1, ¶ 8; doc. # 35-1, ¶ 10; doc. # 42-2, ¶ 10; doc. # 54, ¶¶ 5, 16; doc. # 58.)

25. In the course of his due diligence on the requested loan, Mr. Adams was told by both Mr. Marderosian (as agent for the Moores), and by Mr. Moore, that the loan was being sought to fund settlement of a dispute between the Moores and an associate. (Doc. # 33-2, ¶ 3; doc. # 34-1, ¶3; doc. # 54, ¶ 15; doc. # 58.)

26. In his discussion with Mr. Adams, Mr. Moore indicated that, at that time, he and his wife were living in a short-term apartment rental in Newport, RI. (Doc. # 33-2, ¶ 9; doc. # 34-1, ¶ 9.)

6

*The Loan Commitment from Northborough*

27. After completing the due diligence, Northborough sent a letter to the Moores (a) indicating their loan request had been approved, (b) referencing a "Commercial Mortgage Loan of $1,700,000" to a "Limmited [sic] Liability Company" borrower, (c) describing the use of proceeds as, to "[p]rovide settlement funding" secured by the Property, and (d) stating that "[t]his Commitment shall remain open for your acceptance until February 27, 2017 and shall be voided by Lender if written acceptance and a non-refundable check of $8,500 is not delivered to us by this date." (Doc. # 33, ¶¶ 11–12; doc. # 33-6; doc. # 34-1, ¶¶ 11–12.)

28. The Moores signed the letter as "Borrowers/Guarantors" on or about February 22, 2017, filled in an information sheet listing their Newport, RI apartment as the borrower's address, and returned the signed letter and information sheet to Northborough. (Doc. # 33-6; doc. # 54, ¶ 13; doc. # 58.)

29. On or about Feb 24, 2017, Northborough was paid the non-refundable commitment fee of $8,500. (Doc. # 35-1, ¶ 13; doc. # 42-2, ¶ 13.)

30. On March 3, 2017, counsel for Northborough informed the Moores that the borrower in this transaction would need to be a corporation and not a limited liability company. (Doc. # 35-1, ¶ 15; doc. # 42-2, ¶ 15.)

31. A condition for funding the loan was that the Moores obtain a certificate of insurance naming Northborough as mortgagee and loss payee. The Moores had an existing insurance policy, and their insurance agent indicated that the Moores' existing policy would be void upon their transfer of the property. On advice of their insurance agent, this issue was resolved by the title remaining in the Moores' names and Northborough being added as a loss payee. (Doc. # 35-1, ¶ 17; doc. # 42-2, ¶ 17.)

*The Loan Closing*

32. On March 9, 2017, Northborough made a loan to Birch Wood in the amount of $1,600,000 (the "Loan"), secured by the Property and guaranteed by the Moores, as evidenced by a promissory note, commercial mortgage, and loan agreement. Those documents list Birch Wood as a Vermont corporation with the Property as its principal place of business. The promissory note and loan agreement include provisions that Rhode Island law governs, and the commercial mortgage includes a provision that Vermont law governs. (Doc. # 33-2, ¶¶ 17–18; doc. # 33-7; doc. # 33-8; doc. # 33-9; doc. # 34-1, ¶¶ 17–18.)

33. The promissory note reflects this was a short-term (one year), interest-only loan, consistent with the representations made by the Moores that they were selling their Property to repay the Loan. Section 1.04 of the loan agreement provides, "[t]he proceeds of the Loan shall be used by [Birch Wood] to refinance existing indebtedness, to pay the costs of closing the Loan and for other working capital purposes." (Doc. # 33-2, ¶ 17; doc. # 33-8; doc. # 34-1, ¶ 17; doc. # 54, ¶ 1; doc. # 58.)

34. The Loan closing took place in Bedford, Massachusetts. At the closing, the Moores provided their Florida driver's licenses as proof of identification. (Doc. # 33-2, ¶ 27; doc. # 34-1, ¶ 27; doc. # 54, ¶ 20; doc. # 58.)

35. Adam Clavell, Esq., is an attorney licensed in Massachusetts and Rhode Island and was engaged by Northborough as closing agent for the Loan. The Loan documents were executed at Mr. Clavell's offices in Massachusetts. (Doc. # 33-2, ¶ 2; doc. # 34-1, ¶ 2; doc. # 46, p. 1; doc. # 51, pp. 1–2.)

36. In connection with the Loan, the Moores signed a certification of commercial loan, waiver of federal and state truth-in-lending disclosures, waiver of federal and state prejudgment remedy notices and hearing, and waiver of jury trial. They also signed an affidavit of non-residency. (Doc. # 33-2, ¶ 20; doc. # 33-11; doc. # 33-12; doc. # 34-1, ¶ 20.)

37. The certification of commercial loan, which the Moores signed, stated, "[t]he undersigned further

7

acknowledge their understanding that by certifying that the loan is entirely and solely for business and commercial purposes and not at all for any personal, family, household or other noncommercial or any farming or other agricultural purposes, the undersigned are waiving all rights to Federal and State Truth-in-Lending disclosures." (Doc. # 33-11; doc. # 54, ¶ 19; doc. # 58.)

38. The affidavit of non-residency, which the Moores signed, stated, "We, [the Moores], in order to induce [Northborough] into making a $1,600,000 loan to [Birch Wood], hereby represent and warrant to [Northborough] that we not [sic] now occupying, and shall not occupy during the entire term of the aforesaid loan, including any extension thereof, the [Property] ... for residential purposes, that [sic] the transaction with [Northborough] is commercial in nature." (Doc. # 33-12; doc. # 54, ¶ 19; doc. # 58.)

39. An interest reserve escrow was established to make payment of accruing interest on the Loan. The interest reserve escrow agreement includes a provision that Rhode Island law governs. (Doc. # 33-2, ¶ 19; doc. # 33-10; doc. # 34-1, ¶ 19.)

40. Disbursement of the Loan proceeds was initiated in Massachusetts: Northborough transferred $1.6 million to Mr. Clavell's firm's Massachusetts IOLTA account once all of the Loan documents were executed and delivered. (Doc. # 33-2, ¶ 28; doc. # 34-1, ¶ 28; doc. # 46, pp. 1–2; doc. # 51, pp. 1–2).

41. Mr. Clavell's office disbursed the Loan proceeds, either by wire transfer or by check, in accordance with a written disbursement authorization signed by Birch Wood at the closing, requiring the following disbursements: $950,000 to Mr. Kahn, for settlement of the lawsuit; $263,998.31 to TD Bank, N.A., for a loan payoff; $11,712.09 to the Town of Woodstock for property taxes owed on the Property; and additional disbursements to Northborough, Clubhouse Capital, LLC, and various law firms for fees and interest. Altogether, the disbursements totaled $1,600,000. (Doc. # 35-1, ¶ 18; doc. # 35-10; doc. # 42-2, ¶ 18; doc. # 46, p. 2; doc. # 51, pp. 1–2.)

42. Birch Wood received none of the Loan proceeds (doc. # 46, p. 2; doc. # 51, pp. 1–2).

*Northborough's Lending Experience*

43. On or about July 5, 2019, Northborough's website stated it "has over 50 years of combined real estate experience in the commercial lending arena" and "private lending, loan purchases and real estate holdings since 1990." (Doc. # 35-1, ¶ 21; doc. # 35-11; doc. # 42-2, ¶ 21.)

**DISCUSSION**

Northborough seeks summary judgment that (A) the LLA does not apply to the instant Loan; (B) therefore, Northborough did not violate the LLA; (C) to the extent the Court finds Northborough did violate the LLA, it did not do so knowingly and willfully; and (D) Northborough did not violate the CFA. Conversely, Birch Wood seeks summary judgment that (A) the LLA does apply to the Loan; (B) Northborough violated the LLA; (C) Northborough knowingly and willfully violated the LLA; and (D) Northborough violated the CFA.

A. DOES THE LLA APPLY TO THIS LOAN TRANSACTION?

Northborough argues there are four bases for determining the LLA does not apply to the Loan: (i) the Loan is exempt under 8 V.S.A. § 2201(h), as it is a commercial loan and either the property was not owner occupied or Birch Wood is estopped from claiming it was owner occupied; (ii) the Loan is exempt under 8 V.S.A. § 2221, as it is an out-of-state mortgage loan; (iii) Northborough is not engaged in the business of making loans in Vermont; and (iv) Rhode Island law governs the Loan Transaction.

By contrast, Birch Wood argues none of Northborough's theories for exempting the lender or the

8

Loan Transaction from the LLA has any merit. It asserts (i) the Loan is not exempt under 8 V.S.A. § 2201(h), as it is not by nature a commercial loan and because the property was owner occupied; (ii) the Loan is not exempt under 8 V.S.A. § 2221, as it is not an out-of-state mortgage loan under the LLA; (iii) Northborough is engaged in the business of making loans for purposes of the LLA; and (iv) Vermont law governs the Loan Transaction, but even if the Court finds Rhode Island law governs it, such a finding does not prohibit application of the LLA.

### *i. Is the Loan exempt under 8 V.S.A. § 2201(h) as a commercial loan?*

Northborough argues the LLA does not apply to the Loan because it is exempt under 8 V.S.A. § 2201(h), as a commercial loan and either the property was not owner occupied or Birch Wood is estopped from claiming it was owner occupied (doc. # 33-1, p.9; doc. # 42-1, pp. 10–11; doc. # 57, pp. 5–15; doc. # 60, pp. 1–2). In response, Birch Wood argues the Loan is not a commercial loan and the property was owner occupied (doc. # 34, pp. 8–9; doc. # 35, pp. 7–11; doc. # 51, pp. 2–3; doc. # 55, pp. 4–6).

At the time of the Loan on March 9, 2017 (UMF ¶ 32), the LLA provided, in relevant part, "[t]his chapter shall not apply to commercial loans of $ 1,000,000.00 or more." 8 V.S.A. § 2201(h). The LLA then defined "commercial loan" as "any loan or extension of credit that is described in 9 V.S.A. § 46(1), (2), or (4). The term does not include a loan or extension of credit secured in whole or in part by <u>an owner occupied one- to four-unit dwelling</u>." 8 V.S.A. § 2200(1) (emphasis added).[5]

Here, the parties do not dispute the amount of the Loan is in excess of $1,000,000 (UMF ¶ 32). Thus, the question is whether this is a "commercial loan." Although not specifically alleged in their statements of facts, implicit in both parties' positions is the assumption that the Property is a one- to four-unit dwelling. This singles out for summary judgment, on this claim, the question of whether there is a genuine dispute of material fact whether the Property was "owner occupied" and, if there is no dispute it was not owner occupied, whether one of the three applicable descriptions set forth in 9 V.S.A. §46 applies to the Loan.

In analyzing this question of owner occupancy, the Court relies on the following undisputed facts:

i)  The Moores purchased the Property in about 2007 (UMF ¶ 8).
ii) The Moores lived at various times in Rhode Island and Florida (UMF ¶¶ 7, 8, 9, 10).
iii) The Moores identified their residence as Rhode Island on their 2015 tax return and in the October

---

[5] At the time of the Loan, 9 V.S.A. § 46 provided, in relevant part:
  (1) obligations of corporations, including municipal and nonprofit corporations; or
  (2) obligations incurred by any person, partnership, association, or other entity to finance in whole or in part income-producing business or activity, <u>but not including obligations incurred to finance family dwellings of four units or less when used as a residence by the borrower</u> or to finance real estate which is devoted to agricultural purposes as part of an operating farming unit when used as a residence by the borrower; or
  …
  (4) obligations guaranteed or insured by the United States of America or any agency thereof.
9 V.S.A. § 46(1), (2), (4) (emphasis added).

9

2016 Resolution Agreement (UMF ¶¶ 13, 24).

iv) The Moores described the Property as their "residence property" in the February 2017 Settlement Agreement (UMF ¶ 14).

v) The Moores signed an affidavit of non-residency regarding the Property at the Loan closing (UMF ¶ 38).

vi) During discussions with Mr. Adams, Mr. Moore indicated the Moores were then living in a short-term apartment rental in Rhode Island (UMF ¶ 26).

vii) The Loan documents identify the Property (located in Vermont) as Birch Wood's principal place of business (UMF ¶ 32).

The Court must also take into account the parties' dispute over whether the Moores used the Property as a residence and, if so, whether they disclosed that fact to Northborough (doc. # 33-2, ¶ 9; doc. # 34-1, ¶ 9; doc. # 35-1, ¶¶ 2, 10; doc. # 42-2, ¶¶ 2, 10; doc. # 54, ¶ 16, doc. # 58).[6] The facts underlying whether the Property was owner occupied at the time of the Loan are both material to the claims at issue in the SJ Motions and in stark dispute.

The LLA does not define "owner occupied," and the parties have not cited (nor has the Court found) any case law, statutory language, or legislative history interpreting this term for purposes of the LLA. Thus, the Court looks to other statutory and regulatory sources for guidance in construing the most appropriate definition in the context of the LLA. Another Vermont statute, unrelated to the LLA and pertaining to funded settlements, states it "applies only to transactions involving loans made by lenders, which loans are secured by a first lien on owner-occupied one-to-four-unit residential real estate, including <u>first and second homes</u>." 9 V.S.A § 202 (emphasis added). This use of the term, "owner occupied," as applicable to second homes, indicates property that is owner occupied can be something less than the borrower's principal residence. The Official Staff Interpretations of Regulation Z, 12 C.F. R. Part 226 Supplement I, which pertain to truth in lending, state, "[i]f the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied[.]" This indicates property can be properly characterized as "owner occupied" if a borrower expects to reside in it for at least two weeks in the year following the loan. The Court finds these uses of the term "owner occupied" potentially helpful in defining the phrase for purposes of the LLA. However, they also reveal no consensus as to what time period is to be examined when deciding if property is owner occupied.[7] Moreover, while these sources of guidance do not fully define the parameters of what it means to be owner occupied, they make clear it is a lower standard than is required to establish a principal

---

[6] Birch Wood alleges in the Complaint that the Property was the Moores' personal residence from July 2007 through the time of filing the Complaint (doc. # 1, ¶¶ 15–16), which Northborough denies (doc. # 8, ¶¶ 15–16).

[7] The Court does not decide at this time what the relevant time period is for determining whether the Property was owner occupied, but the following time periods appear to present some viable possibilities: (i) the one-year post-loan period cited in the Official Staff Interpretation of Regulation Z; (ii) a three-year pre-loan period applied to determine whether a lender is in the business of making loans in LLA § 2201(d)(16); and (iii) the approximately ten-year period between the date the Moores purchased the Property and the date of the Loan (UMF ¶ 8).

residence or homestead requirement.

The Court is not persuaded by Northborough's argument that the Property could not have been owner occupied because Birch Wood is a corporation. Northborough provides no case law or other legal support for its contention that the LLA precludes application of the "owner occupied" exception to a commercial loan where the principals of an owner corporation reside at the property. Nor is the Court persuaded by Northborough's argument that Birch Wood should be equitably estopped from claiming the Property was owner occupied, at least for summary judgment purposes, given the dispute of material fact over whether the Moores disclosed to Northborough whether they were residing at the Property. See My Sister's Place v. Burlington, 139 Vt. 602, 609 (1981) ("the four elements of equitable estoppel are: (1) [the] party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.") (emphasis added).

Since there is a dispute of material fact with regard to (1) when the Moores resided at the Property and (2) whether the Moores disclosed that information to Northborough, and those facts are material to the Court's determination of whether the Property was "owner occupied" at the time of the Loan, the Court finds summary judgment is improper as to the first line of inquiry related to the applicability of the LLA, namely whether the Loan is exempt under 8 V.S.A. § 2201(h) as a commercial loan.

### ii. *Is the Loan exempt under 8 V.S.A. § 2221 as an out-of-state mortgage loan?*

Northborough's second argument, in support of its position that the LLA does not apply to this Loan, is the Loan is exempt under 8 V.S.A. § 2221 because it is an out-of-state mortgage loan (doc. # 33-1, pp. 7–8; doc. # 42-1, pp. 7–8, 17; doc. # 46, pp. 1–8; doc. # 57, pp. 13–21). Birch Wood argues the Loan is not an out-of-state mortgage loan under the LLA (doc. # 34, pp. 5–7; doc. # 35, pp. 6–7; doc. # 51, pp. 2–10) and therefore the LLA does apply.

At the time of the Loan, the LLA provided, in relevant part:

> A mortgage loan made outside Vermont for use outside Vermont shall be deemed to be made outside the state of Vermont and shall not be subject to this chapter except upon written agreement of the borrower and the licensee.

8 V.S.A. § 2221 (emphasis added). This creates a two-prong test.

There is no dispute as to the first prong: the parties both acknowledge the Loan is a mortgage loan (UMF ¶ 32) made outside Vermont. The Loan closing took place in Bedford, Massachusetts (UMF ¶ 34) and the Loan documents were executed at the offices of Northborough's closing agent, Mr. Clavell, in Massachusetts (UMF ¶ 35). For summary judgment purposes, then, the Court must determine if there is a genuine dispute of material fact as to the second prong of this provision: whether the Loan was made "for use outside Vermont."

11

In this inquiry, the Court relies on the following undisputed facts:

i) At least some of Northborough's due diligence in connection with the Loan occurred in Vermont, namely: Mr. Adams completed a site visit to the Property on or about February 25, 2017, with Mr. Moore present; and Mr. Adams obtained an appraisal of the Property (UMF ¶ 24).

ii) Northborough made the $1,600,000 Loan to Birch Wood, which is a Vermont corporation, and the Property (located in South Woodstock, Vermont), which is collateral securing the Loan, is Birch Wood's principal place of business (UMF ¶ 32).

iii) The loan agreement provides that "[t]he proceeds of the Loan shall be used by [Birch Wood] to refinance existing indebtedness, to pay the costs of closing the Loan and for other working capital purposes" (UMF ¶ 33).

iv) Mr. Clavell's office distributed the closing proceeds, totaling $1,600,000, per the written disbursement authorization signed by Birch Wood at the closing (UMF ¶¶ 14, 41).

v) This included some disbursements to out-of-state payees, namely: $950,000 to Mr. Kahn, for settlement of the lawsuit; $263,998.31 to TD Bank, N.A., for a loan payoff; and additional disbursements to Northborough, Clubhouse Capital, LLC, and various law firms for fees and interest (UMF ¶ 41).

vi) This also included at least one disbursement to a Vermont payee, namely: $11,712.09 to the Town of Woodstock for property taxes owed on the Property (UMF ¶ 41).

vii) Birch Wood received none of the Loan proceeds (UMF ¶ 42).

Northborough argues the question of what "for use outside of Vermont" means should turn solely on whether the borrower received the loan proceeds outside of Vermont, and consequently the location of any non-borrower disbursement payees is irrelevant. Northborough further argues that even where there is a Vermont borrower, the essential nexus to Vermont under § 2221 is missing if the borrower does not receive any loan proceeds. Northborough cites R&G Properties, Inc. v. Column Fin., Inc., 184 Vt. 494 (2008), for the proposition that § 2221 should be construed as having no extraterritorial effect, and claims that application of § 2221 to the Loan would constitute an unconstitutional regulation of extraterritorial commercial activity. Since the Loan was made and fully disbursed by the closing agent outside Vermont, and since Birch Wood did not receive any of the proceeds, Northborough asserts the Loan meets this definition and the LLA § 2221 exception should apply. Northborough also contends that, even if the Court does consider the location of non-borrower disbursement payees to be relevant, having the majority of the proceeds distributed to parties located outside Vermont is sufficient to satisfy this prong of the exception and qualify under the LLA as a Loan made "for use outside Vermont."

By contrast, Birch Wood argues the location of closing is irrelevant to whether the loan is made "for use outside Vermont," and the analysis should depend instead on whether any loan proceeds are used

to pay a debt owed to a Vermont creditor. Birch Wood cites Gorman v. Marcon Capital Corp. (In re Gorman), 274 B.R. 351 (D. Vt. 2002) for the proposition that loan proceeds are "used in Vermont" where the borrower is a Vermont company and the loan proceeds are used to pay off debts owed to a Vermont creditor, and if those circumstances are present, the LLA may apply even to a non-Vermont lender. Since the Loan was made to Birch Wood, a Vermont corporation with its principal place of business in Vermont, and since some of the Loan proceeds were used to pay off debts owed to the Town of Woodstock, a Vermont creditor, Birch Wood asserts the Loan does not meet the definition of a loan made "for use outside Vermont" and the LLA § 2221 exclusion should not apply.

      The Court finds Gorman to be dispositive with regard to both the applicability of the LLA to out-of-state lenders and the limits of what constitutes a loan made "for use outside Vermont." As the United States District Court for the District of Vermont observed in that case, "[t]he LLA 'seeks to regulate both in-state and out-of-state lenders,' … however, it provides a limited exemption for 'out-of-state' loans.'" Gorman, 274 B.R. at 358 (citing Green Tree Credit Corp. v. Kenyon, 163 Vt. 631, 633 (1995)). In Gorman, the court reviewed an earlier version of LLA § 2238, which exempted out-of-state commercial loans, and defined "out-of-state" loans as those commercial loans "made to a borrower located outside of Vermont for use outside of Vermont." Id. (emphasis added). The court determined:

> In this case it is clear that the loan proceeds were to be used in Vermont. The term sheet agreement provided that the proceeds were to be used by [borrower] GRR, a Vermont company with its principal place of business in Vermont, for use in paying off debts owed to a Vermont bank. In addition, the loan negotiations occurred in Vermont. The letter drafted by [lender] Marcon and attached by Marcon to [a vice-president of lender] Enright's affidavit states that Marcon 'has conducted various due diligence investigations and meetings with [GRR] in Vermont.' The location of a closing which never even occurred is irrelevant.

Id. (internal docket citation omitted).

      Although Northborough contends Gorman is not helpful because it construes a different section of the LLA, the Court finds this argument to be without merit. The language at issue in Gorman – for use outside of Vermont – is substantively identical to the "for use outside Vermont" language here. The facts here are also similar to those in Gorman. Here, the Loan was made to Birch Wood, a Vermont company with its principal place of business in Vermont. Birch Wood's principals used a substantial portion of the Loan proceeds to pay their obligations to Mr. Khan under the Settlement Agreement. Although most of the Loan proceeds were disbursed, at Birch Wood's instruction, to parties outside of Vermont, at least some of the Loan proceeds ($11,712.09) were used to pay a debt to a Vermont creditor (the Town of Woodstock) for real estate taxes owed on – and secured by – Vermont real property. Further, Northborough conducted at least some due diligence for the Loan at the Property, in Vermont. While the instant facts differ from those in Gorman in that here the parties' closing occurred outside Vermont, the

13

Court finds that fact dispositive only of whether the Loan was "made outside Vermont" (see § A.i, infra) and of no import in the analysis of whether the Loan was made "for use outside Vermont."

The Court is not persuaded by Northborough's reliance on R&G Properties either, because the facts, and statutory text in effect at the time that case was decided, were quite distinct from those at bar. There, the Vermont Supreme Court interpreted an earlier version of LLA § 2201(c)(9), which exempted lenders who made "only commercial loans of $1,000,000 or more." R&G Properties, 184 Vt. at 502. The lender had only ever made two commercial loans, including the loan to the borrower at issue, both of which were greater than $1,000,000, and had made no consumer loans in Vermont while unlicensed. Id. at 512. The borrower argued the lender had made smaller loans outside Vermont and those loans prevented application of the exception. Id. at 502. The court interpreted that LLA exception not to encompass out-of-state lending activity and, since all of the lender's activity in Vermont was exempt, the Court found it did not violate the LLA. Id. at 513–14. Unlike in R&G Properties, where there was no question the loans at issue were extraterritorial, here there is a clear nexus to Vermont because the borrower is a Vermont corporation with its principal place of business in Vermont, the lender conducted at least some due diligence in Vermont, and the proceeds were used in part to pay off debts owed to a Vermont creditor.

Based on the facts and circumstances of the loan transaction in this case, which are similar to those in Gorman and unlike those in R&G Properties, the Court finds the Loan is not extraterritorial.[8]

Northborough also argues that it is entitled to relief by analogy to 11A V.S.A. § 15.01(c)(7), asserting that the LLA § 2221 exception should apply even if the real estate securing a mortgage loan is located in Vermont. That statute provides that "creating or acquiring indebtedness, mortgages, and security interests in real or personal property" does not, without more, constitute "transacting business" for the purpose of determining whether a foreign corporation is required to obtain a certificate of authority from the Vermont Secretary of State. 11A V.S.A. § 1501(c)(7). However, it is not germane here, as this Court's determination is not based on the location of the Property merely as the real estate securing the Loan, but rather on the location of the Property as Birch Wood's principal place of business and as the location where Northborough conducted some of its due diligence in connection with the Loan.

Based on the undisputed material facts and the foregoing analysis, the Court determines the Loan was not made "for use outside Vermont." The use of the Loan proceeds – by a Vermont corporation, with its principal place of business in Vermont, and in part for payment to a Vermont town – is sufficient to bring this Loan outside the definition of a loan made "for use outside Vermont" for purposes of the LLA.

Since there is no dispute of material fact on this issue, the Court finds summary judgment is

---

[8] Since the Court finds the Loan is not extraterritorial based on the undisputed material facts, the Court does not need further briefing on the constitutionality of applying LLA § 2221 to an extraterritorial loan (see doc. # 57, p. 21), and certification to the Vermont attorney general is not required. See 28 U.S.C. § 2403(b); see also Vt. LBR 7024-2.

14

proper. The Court determines, as a matter of law, that this Loan is not a loan made "for use outside Vermont," and therefore the Loan is not exempt from the LLA under 8 V.S.A. § 2221 as an out-of-state mortgage loan. Accordingly, Birch Wood's SJ Motion is granted, and Northborough's SJ Motion is denied, as to the application of § 2221 of the LLA.

   *iii. Is Northborough engaged in the business of making loans for purposes of the LLA?*

Northborough's third basis for arguing this Loan transaction is exempt from application of the LLA relies on 8 V.S.A. § 2201(d)(16)[9] and its insistence that Northborough has not made more than three mortgage loans in Vermont (doc. # 33-1, pp. 9–10; doc. # 42-1, pp. 11–12; doc. # 57, pp. 3–4). Northborough further contends that, even if it is not exempt under § 2201(d)(6), the LLA does not apply to the Loan because Northborough is not "engaged in the business of making loans" in Vermont (doc. # 33-1, pp. 8–9; doc. # 42-1, pp. 7–9; doc. # 57, pp. 2–4). Birch Wood counters that Northborough has made more than three mortgage loans that are properly considered in determining the applicability of LLA § 2201(d)(16), and further argues the seminal provision only creates a rebuttable presumption a lender is not in the business of making loans, rather than an absolute exemption, and is inapplicable because this is a residential mortgage loan (doc. # 34, pp. 10–11; doc. # 55, p. 4). Birch Wood maintains Northborough is engaged in the business of making loans for purposes of the LLA (doc. # 34, pp. 7–8; doc. # 35, pp. 5–7; doc. # 55, pp. 3–4).

At the time of the Loan on March 9, 2017 (UMF ¶ 32), the LLA provided, in relevant part:

> (a) No person shall without first obtaining a license under this chapter from the Commissioner:
>
>> (1) engage in the business of making loans of money, credit, goods, or things in action and charge, contract for, or receive on any such loan interest, a finance charge, discount, or consideration therefor;
>
> …
>
> (d) No lender license, mortgage broker license, or sales finance company license shall be required of:
>
>> …
>>
>> (16) A person who makes no more than three mortgage loans in any consecutive three-year period beginning on or after July 1, 2011.
>
> (f) If a person who offers or negotiates the terms of a mortgage loan is exempt from licensure pursuant to subdivision (d)(16) or (e)(6) of this section, there is a rebuttable presumption that he or she is not engaged in the business of making loans or being a mortgage loan originator.

8 V.S.A. § 2201(a)(1), (d)(16), (f).

---

[9] Northborough erroneously cites to this provision of the LLA as "8 V.S.A. § 2201(d)(3)" (doc. # 33-1, p. 9), which addresses "[a] gas or electric utility subject to the jurisdiction of the Public Utility Commission engaging in energy conservation or safety loans." 8 V.S.A. § 2201(d)(3). Based on the parties' papers and the language of the LLA, it is clear Northborough's argument pertains to § 2201(d)(16).

15

As an initial matter, the Court rejects Birch Wood's argument that LLA § 2201(d)(16) is wholly inapplicable because the Loan is a residential mortgage loan, and at the time of the Loan LLA § 2201(d)(16) referenced "mortgage loans," defined in § 2200(16) as "a loan secured primarily by a lien against real estate," not "residential mortgage loans," defined in § 2200(23).[10] There is no dispute the Loan is a mortgage loan (UMF ¶ 32) as defined in § 2200(16). Whether it also meets the definition of a "residential mortgage loan," as used elsewhere in the LLA, is irrelevant.

Turning to the applicability of § 2201(a)(1), (d)(16), and (f), it is undisputed that Northborough is engaged in the business of making loans: Northborough holds itself out as a commercial lender with over 50 years of experience, including private lending, loan purchases, and real estate holdings since 1990 (UMF ¶ 43). Although not specifically alleged in their statements of facts, implicit in both parties' arguments is the assumption that Northborough has made more than three mortgage loans in all consecutive three-year periods beginning on or after July 1, 2011. Thus, for summary judgment purposes, the Court must determine which of Northborough's loan activity is relevant to deciding whether Northborough has made "no more than three mortgage loans" or has "engage[d] in the business of making loans" under LLA § 2201, and whether there is a material dispute of fact as to the extent of that loan activity.

Northborough relies on R&G Properties, here for the proposition that the Court should only consider Northborough's loan activity in Vermont when determining the applicability of § 2201. However, the facts here are much less clear than those in R&G Properties. In that case, the court found all of the lender's activity in Vermont was exempt. R&G Properties, 184 Vt. At 514. The only loan activity that could have brought that lender within the purview of the LLA was unequivocally extraterritorial, and the Vermont Supreme Court declined to interpret the LLA to have extraterritorial effect. Id. at 502, 513. A lender is not shielded from the LLA merely for being an out-of-state lender, as "[t]he LLA 'seeks to regulate both in-state and out-of-state lenders.' Gorman, 274 B.R. at 358.

Here, the Court has not determined whether the Loan is exempt. There is a question for trial as to whether the Property was "owner occupied" at the time of the Loan (or whether Birch Wood should be equitably estopped from asserting that it was), and thus whether the Loan is exempt under LLA § 2201(h) (see § A.i, infra). Further, the parties dispute the extent of Northborough's other loan activity in Vermont, including whether Northborough advertises, solicits business, or makes loans in Vermont, or makes other loans involving collateral in Vermont (doc. ## 33-2, ¶¶ 22, 24–25; doc. # 34-1, ¶¶ 22, 24–25; doc. # 35-1, ¶ 21; doc. # 42-2, ¶ 21). Depending on the outcome of other issues at trial, these facts may also be material to the question of Northborough's relevant loan activity and the Court's determination of whether Northborough has made "no more than three mortgage loans" or has "engage[d] in the business of making

---

[10] Birch Wood erroneously cites to the current version of those definitions in 8 V.S.A. § 2200(19) and (26); however, the substance of the definitions is the same.

loans" for purposes of the LLA. Since there is a genuine dispute regarding these facts, the Court finds summary judgment is improper as to the application of LLA § 2201(a)(1), (d)(16), and (f).

### iv. *Does Rhode Island law govern this Loan Transaction and preclude application of the LLA?*

Northborough argues the LLA does not apply to this Loan transaction because Rhode Island law governs (doc. # 33-1, pp. 6–7; doc. # 42-1, pp. 15–17). Birch Wood does not address or seek summary judgment on this issue in its SJ Motion. In its response to Northborough's SJ Motion, however, Birch Wood argues, first, that Vermont law governs this Loan Transaction and, second, even if the Court finds Rhode Island law governs, such a finding does not prohibit application of the LLA (doc. # 34, pp. 2–5).

In In re Mayo, 112 B.R. 607 (Bankr. D. Vt. 1990) (Conrad, J.), the court found:

> [Lender] BWAC's argument that because the law of Illinois was the expressed choice of law within its security agreement with [borrower] Mayo, d/b/a Vermont Custom Boats it is excused from compliance with the statute's licensing requirements regardless of where and how the loan was made.
>
> While we do not question the basic premise that parties may agree under Vermont's UCC's choice of law provision, 9A Vt.Stat.Ann. § 1-105, that the substantive law of a different State bearing a "reasonable relation" to the security transaction will govern the rights and duties of the contracting parties, this will not permit the contracting away or the excuse of noncompliance with the applicable non-chosen State's licensing requirements.

Mayo, 112 B.R. at 643 (emphasis added). The court in Mayo went on to opine that whether the lender was required to have a license under the LLA was dependent on whether the evidence adduced at trial showed the LLA's out-of-state loan exemption applied. Id. at 644.

The Court finds Mayo to be dispositive here. The parties are in accord that the promissory note, loan agreement, and interest reserve escrow agreement state Rhode Island law governs, and the commercial mortgage states Vermont law governs. (UMF ¶¶ 32, 39). However, those Rhode Island choice of law provisions do "not permit the contracting away or the excuse of noncompliance with" the licensing requirements of the LLA. Mayo, 112 B.R. at 643. Rather, the question of whether the LLA applies to the Loan is dependent on the following evidence at trial: (1) whether the Loan is exempt as a commercial loan (see § A.i, infra), and (2) whether Northborough is engaged in the business of making loans (see § A.iii, infra). Therefore, the Court denies the portion of Northborough's SJ Motion seeking a determination that the LLA does not apply to this Loan Transaction because Rhode Island law governs.

### B.  DID NORTHBOROUGH VIOLATE THE LLA?

Northborough argues that, because the LLA does not apply to the Loan, Northborough did not violate the LLA (doc. # 33-1, p. 10; doc. # 42-1, p. 7; doc. # 57, pp. 1–2). Birch Wood argues the LLA does apply to the Loan, and therefore Northborough violated the LLA by making the Loan at a time when it did not have the license the LLA requires (doc. # 35, p. 4).

17

Although not specifically alleged in their statements of fact, implicit in both parties' filings is the assumption that Northborough was not licensed under the LLA at the time of the Loan. Since the Court has found summary judgment is not proper on the issue of whether the LLA applies to this Loan Transaction (see § A, infra), summary judgment is also unavailable as to whether Northborough violated the LLA.

### C. DID NORTHBOROUGH KNOWINGLY AND WILLFULLY VIOLATE THE LLA?

Northborough argues that, even if the Court finds Northborough violated the LLA, Northborough did not knowingly and willfully do so, as it did not know about the LLA at the time of the Loan Transaction (doc. # 33-1, p. 10; doc. # 42-1, pp. 12–13; doc. # 57, pp. 21–22). Birch Wood rejects that argument as flawed, and counters that Northborough knowingly and willfully violated the LLA, by virtue of having intentionally made the Loan to Birch Wood (doc. # 35, pp. 11–12).

Since the Court has found summary judgment is not proper on the issues of whether the LLA applies to the Loan Transaction (see § A, infra) and whether Northborough violated the LLA (see § B, infra), the Court must deny summary judgment on the question of whether Northborough violated the LLA knowingly and willfully.[11]

### D. DID NORTHBOROUGH VIOLATE THE CFA?

Northborough argues it did not violate the CFA because it did not violate the LLA, and also posits the Court should not consider Birch Wood's additional summary judgment allegation regarding the CFA because Birch Wood failed to raise it in the Complaint (doc. # 33-1, p. 10; doc. # 42-1, pp. 14–15). Birch Wood's position is that Northborough violated the CFA both by violating the LLA and by requiring an upfront fee of $8,500 without advising Birch Wood's principals they would be required to execute a non-residency affidavit (doc. # 34, pp. 11–12; doc. # 35, pp. 12–13).

The CFA prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453. This mirrors language in the LLA that "[i]t is a violation of this chapter for a person or individual to … engage in any unfair or deceptive practice toward any person." 8 V.S.A. § 2241(2).

Since the Court has found summary judgment improper as to whether the LLA applies to the Loan Transaction (see § A, infra) and whether Northborough violated the LLA (see § B, infra), summary judgment is also improper as to whether any violation of the LLA by Northborough also constitutes a violation of the CFA.

With regard to Northborough's other conduct that Birch Wood asserts is a violation of the CFA, it is undisputed that Northborough (a) sent a letter to the Moores stating the loan commitment letter would

---

[11] Without deciding whether any violation of the LLA was knowing and willful, the Court observes the parties disagree about whether Northborough was aware of the requirements of the LLA at the time of the Loan (doc. ## 33-2, ¶ 15–16; doc. # 34-1, ¶¶ 15–16; doc. # 54, ¶ 17; doc. # 58, p. 2–4).

18

be void if they failed to deliver a written acceptance and non-refundable $8,500 check by February 27, 2017 (UMF ¶ 27), (b) Northborough was paid the $8,500 commitment fee on or about February 24, 2017 (UMF ¶ 29), and (c) the Moores signed an affidavit of non-residency in connection with the Loan (UMF ¶ 36). However, the parties disagree as to whether the Moores were residing at the Property and, if so, whether the Moores disclosed that fact to Northborough (see § A.i, infra). The parties also disagree about whether Birch Wood or the Moores were aware of, or had an opportunity to review, the affidavit of non-residency prior to the Loan closing (doc. # 33-2, ¶¶ 20–21; doc. # 34-1, ¶¶ 20–21; doc. # 54, ¶ 18; doc. # 58, pp. 1–2; doc. # 60). These disputed facts are material to the question of whether the $8,500 commitment fee is an unfair or deceptive act or practice in commerce under the CFA.

With respect to Northborough's argument that Birch Wood failed to raise earlier its additional CFA claim regarding the $8,500 commitment fee, Birch Wood indicates that "[a]s a result of discovery, [Birch Wood] has confirmed that the first time that [Birch Wood or the Moores] were presented with the loan documents was at the settlement" (doc. # 34, p. 11). However, Birch Wood does not explain why this purportedly new information was not available to the Moores prior to discovery or why Birch Wood could not have alleged this claim in its Complaint. Thus, the record is both disputed and insufficient for a determination on the additional CFA claim, and summary judgment is improper.

## CONCLUSION

Based on the foregoing analysis and findings, the Court finds summary judgment is proper, and Birch Wood is entitled to judgment as a matter of law, solely as to one of the four criteria for determining whether the subject Loan Transaction is governed by the LLA: namely, that the Loan is not an out-of-state mortgage loan and thus is not exempt from the LLA under 8 V.S.A. § 2221.

However, there are genuine disputes of material fact with respect to the other three criteria that could potentially render the LLA inapplicable. Accordingly, the Court denies summary judgment on the global issue of whether the LLA applies to this Loan Transaction. The Court further finds summary judgment is improper as to the other three issues presented here, i.e., whether Northborough violated the LLA, did so knowingly and willfully, or violated the CFA. In sum, the Court grants in part, and denies in part, Birch Wood's motion for summary judgment and denies Northborough's motion for summary judgment in its entirety. The Court will set this matter for trial to address all remaining issues.[12]

This memorandum of decision constitutes the Court's findings of facts and conclusions of law.

April 24, 2020  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

---

[12] The SJ Motions included numerous overlapping arguments and variations on the parties' primary contentions. The Court has considered all of the parties' arguments and, to the extent not specifically addressed herein, finds them to be without merit.